We will hear argument next in number 2011, one of Technology Patents, LLC, against Deutsche Telekom, and others, 130 some-odd others. MR. BORREN Before we begin, and while Mr. Rowe is getting his materials out, let me make sure I understand what the lineup is going to be on the Applebee's side. Mr. Feinberg? MR. FEINBERG I'm Mr. Borren. MR. BORREN I'm Mr. Borren. MR. FEINBERG Mr. Borren, all right. So are you going first? MR. FEINBERG Yes, Your Honor. MR. BORREN And on behalf of which party? MR. FEINBERG On behalf of the carrier and handset defendants. MR. BORREN The domestic carriers? MR. FEINBERG Yes, sir. MR. BORREN  And you are going to use ten minutes? MR. FEINBERG Ten minutes, yes, Your Honor. MR. BORREN  And then who's second? MR. FEINBERG George Pappas, Your Honor. I'm here on behalf of three software providers. MR. BORREN Yes, sir. MR. FEINBERG Flickr, Microsoft, and Yahoo. MR. BORREN Five minutes, Your Honor. MR. FEINBERG You're going to use five minutes. All right. And now, finally, Mr. Feinberg. MR. FEINBERG  I'm appearing for four carriers. MR. BORREN Right. MR. FEINBERG And I get the remaining five minutes. MR. BORREN All right. Now, I think the time for you all will be kept separately for each of you so that when you look at the clock, you don't have to do any mental math.   Okay. I think we're ready to go. Mr. Romano. MR. ROMANO Yes, Your Honor. MR. BORREN All right. Mr. Feinberg. MR. FEINBERG Thank you, Your Honor. MR. BORREN May it please the Court. The district court granted summary judgment to Klickatell et al. for non-infringement. That summary judgment decision directly conflicts with this Court's decisions in both NTP and in Centillion. At issue here are system claims, not method claims. In both NTP and Centillion, this Court explains that customers sending messages use a telecommunications system, even if they don't physically have in their possession all of the components. MRS. BORREN Let me just be clear, because there are a lot of claims on a lot of parties. Are we addressing here a certain subset of claims, namely the originating user claims? And I can give you the numbers just to be clear, and not the entire range of claims that are at issue with respect to all the carriers, at least in the software. MR. FEINBERG The claims for Klickatell et al. are different than the claims for AT&T et al. For Klickatell et al., the customers infringe claims 4 through 6, 8 through 9, 11 through 18, and 21 through 29. Those are all system claims. And the companies would infringe claims 4 through 6, 8 through 9, and 16 through 18. Those are, again, all system claims. So with Klickatell et al., all we're talking about is system claims. For AT&T, the only claims that are at issue are claims 4 through 8. So in Centillion and NTP, this Court explained that customers sending messages use a telecommunications system. They are direct infringers under 35 U.S.C. Section 271A. Klickatell moved for summary judgment. In the summary judgment in favor of Klickatell, the District Court used the wrong standard of review. Instead of using the standard of review set forth in NTP and Centillion and the Supreme Court in Bauer, where use was explained, the District Court used a standard of review from NTP that is based on method claims and vicarious liability requirements for joint infringement. That was error. The standard of review here is that which is set forth in Centillion and NTP and by the Supreme Court in Bauer. It is not what is set forth in BMC Immunity Option. And that's because here we have the exact same situation that we had in NTP. Customers sending messages are direct infringers because they use the system when they send messages. All components of the claim are put into service when they send messages. The District Court has a footnote that simply says the customers do not directly infringe. There's no explanation as to why. There's no analysis. So it's unclear from the District Court's opinion exactly why the District Court thought when you're saying customers, you're talking about the user, right? The person who's actually sending the message. Yes, the originating user who sends the message. All right. Yes. And the receiving user. Is that also a customer? The receiving user. There's a dispute about the construction of receiving user, but if you want me to say that here for that purpose as a click and tell, that's fine. All right. That's fine. So from the District Court's opinion, it's unclear why the District Court found the customers were not direct infringers. It was in a footnote, one sentence, there was no analysis. The same thing for why the District Court found that click and tell, Microsoft and Yahoo were not direct infringers. The District Court simply said the Bates Declaration is conclusory. It didn't provide any analysis. What the District Court did, it clearly said that plaintiff's joint infringement theory doesn't work in a grand summary judgment. Well, we never had a joint infringement theory. We told the District Court we were not arguing joint infringement with respect to these defendants. So the District Court used the wrong standard of review. So you are arguing based solely on 271, Section 271 of the statute? That's correct, Your Honor. Yes. For click and tell at all, our argument was the customers infringe under 271A because they're direct infringers just like in NPP, just like in Centillion. Okay. And these companies induce those infringements by providing instructions, hardware, advertisements, etc. that cause the infringement. Wasn't there an issue about whether or not you weighed this question? Whether you weighed the argument about under Centillion? Is that in dispute here? Not that I'm aware of. There was a footnote, maybe Your Honor is referring to this, there was a footnote in one of the briefs that said to the extent that plaintiff contends Centillion is new law, it didn't adequately raise it with the District Court, we don't contend Centillion is new law. Centillion simply says what NPP says. So Centillion is not new law. Centillion came out after the District Court's decision, but we made all these exact same arguments to the District Court in this case. I have a question that you can answer real quickly and go on. Let's say we were to affirm non-infringement in favor of the U.S. securities. Does that render moot the jurisdictional question involving the foreign couriers? No, Your Honor. Why wouldn't it? There could be multiple theoretical reasons why non-infringement for the U.S. securities could be affirmed. For instance, it all depends what the court says. If the court says, well, you didn't establish X, Y, or Z. It's the same system, right? I mean, both the foreign couriers and the U.S. couriers are using basically the same system, the same invention. There is much overlap, Your Honor, and there are certainly scenarios where if the court found non-infringement for certain reasons, where yes, that would dispose the foreign carriers. But I can imagine there also being scenarios where it wouldn't necessarily resolve the foreign carrier issues. That's for liability, but just for pure jurisdiction. Would that render the jurisdiction issue moot in this suit? I don't believe so, Your Honor, because the foreign carriers were dismissed early on. We never had a chance to take discovery, no expert reports, etc., Your Honor. So for Cliquetel et al., the wrong standard of review was used below. It was error. It's in direct conflict with NTP, with the Supreme Court's decision of Bauer and in Centillion. If there are no questions on Cliquetel, I'll move on to the AT&T et al. summary judgment. In the AT&T sections of our brief, we have a picture that we put in both briefs. In the blue brief, it's at page 29. It's a picture of a handset where a finger is coming in and pushing a button. Page 29 of the blue brief, page 12 of the reply brief. That button has two things on it. It says O2 and it says DE. O2 is the name of the carrier. DE is the abbreviation for the country Germany. The district court found on summary judgment that the person does not input the country. Now this argument I'm explaining now, I'm using the district court's claim construction. Just to be clear, I guess there's so much going on in this case that it's hard to follow. You've got, with respect to these carriers, you've got two issues. The claim construction issues and then even, so you're accepting the person in your discussion right now, the claim construction, the district court, and just arguing on the infringement stuff? Yes, Your Honor. The argument, I apologize for not making that clear. For the argument I'm making right now for AT&T, I'm assuming the incorrect claim construction is by the district court. Okay. The district court found on summary judgment that no reasonable juror could find that the RU, that's receiving user, inputs a country. Here in this picture, we have a finger pressing a button that has a country abbreviation on it. Well, it has a carrier. The carrier happens to be designated as DE, let's say, but that doesn't mean the user is inputting a country, correct? I mean, that doesn't mean that that system can only be used by a person who is standing in Germany at the time, correct? I'm not sure I understand the second half of your question, Your Honor. In other words, I've decided to use Vodafone DE as my carrier for a particular purpose while I'm in some part of Europe. I could be in Switzerland, let's say, close to Germany and still use Vodafone DE, correct? Theoretically, that could be possible. Yes, Your Honor. I'm selecting a carrier, I'm not selecting a country. I'm selecting a carrier that happens to be principally serving that country, but that's not the same as selecting a country, right? I would disagree with that, Your Honor, respectfully. Vodafone DE. DE is not part of the name of Vodafone. The name of that carrier is Vodafone D2. So here on this screen, Vodafone is referring to the carrier and DE is referring to the country. It's to allow the person to know which country you're picking. What does E-plus mean in that picture? E-plus is the name of a carrier in Germany. E does not stand for any country, E-plus is part of the name of the carrier. But DE is Germany and you're suggesting, I mean, the district court on this regard says that you're not, as Judge Bryson pointed out, you're not designating a country here, you're designating a carrier within a country, right? The district court didn't really address this argument. What the district court found is the RU is selecting a carrier, not a country. That's what the district court said. And we disagree. If a person is pushing a button that has an abbreviation for a country on it and pushing that button causes the system to send a country code that corresponds to that country abbreviation, a jury could easily and probably would find that that person is inputting a country. Because the carrier is linked to the country code, so you're saying it's sufficient to... Yes, Your Honor. Every time someone pushes that button, two codes get sent. The country code gets sent and the carrier code gets sent. Every time that button is pushed. It's not just the carrier code. Does it matter, let's say, that you're not in Germany and you push that code? Let's say you're in France and you push the O2DE code. You're not selecting Germany. I mean, you're not in Germany. Your Honor, I don't see how it matters because you're still inputting a country. The claim says that you're inputting a country and the district court's decision was the person cannot input a country. I don't see where it really matters where the person is. So DPL's position is the district court shouldn't be making findings of fact on summary judgment where the picture shows you're pushing a button that has a country abbreviation on it and that causes a country code to be sent. A jury could easily find that the person is inputting a country. That's what they're doing. They're actually inputting both a country and a carrier because both codes go together. But there's nothing in the record to suggest that the accused device is the ROU that is designating a country without designating a carrier, right? No, Your Honor, that's correct. The record establishes that when that button is pushed, both the country code and the carrier code are sent. The level of ordinary skill in the art in this case requires significant technical training in this field. Again, the district court on disputed issues of fact like this where we have an unrebutted declaration stating that the country is input, the district court shouldn't be going out of its way to make findings of fact. Similarly, with respect to an ROU creating an ordered list, that's another finding of fact that's erroneous that the district court made. The list comes into being when the person pushes a button. So a jury could easily find that if the list comes into being when you push a button, that person is creating that list. Now this list, I take it, in the case, you're saying that when the person pushes the Vodafone DE button, the list is created because the U.S. becomes the second country or wherever the country of origin was. Is that your theory of infringement? In the declaration, Your Honor, when the person pushes, let's say, the F-guide button or the F-orange button, pushing that button causes two country codes to be sent. The country code for France is sent and then the country code for the U.S. is sent behind that. That's the origin of the… Yes, Your Honor. Yeah, okay, well that was what I was asking. That's what you consider to be the ROU creating an ordered list, right? Yes, Your Honor. All right. Now I'm going to turn to what we believe are incorrect claim constructions as to the AT&T at all. There's no creating an ordered list three, for example. It's only limited to two, I take it. Yes, Your Honor. And the second is always the same. If it's a U.S.-based handset. Right, right. It's always the same with respect to an individual handset. Yes, Your Honor. All right. Claim construction. The first claim construction that we believe is erroneous is reading in created by the ROU in the last paragraph of Claim 4. Claim 4 in the last paragraph calls for a system that initiates paging operations in another country in a predetermined order. There's nothing in that limitation that says anything about an ordered list. More importantly, there's nothing that says anything about an ordered list that is created by the ROU. It was error for the district court to read created by the ROU into the last paragraph of Claim 4 with respect to an ordered list. It's contrary to the claim language because the claim language is referring to the system, what the system does. There's nothing in the prosecution history that would cause this to be read in from the specification. There was never any argument made during prosecution about how any ordered list was created or by whom. There's no statement in the specification that says the invention is an ordered list created by the receiving user. In contrast, the specification states that ROUs or subscribers may remotely input a list of countries, indicating that that is not a critical, all-important feature of the invention. There's no textual hook in Claim 4 for reading in created by the ROU regarding that ordered list. There's nothing in Claim 4 that would ever lead anyone of skill in this order to believe that Claim 4 requires a list that is created by the ROU. So that claim construction is incorrect. You're well into your rebuttal time. Do you want to save the rest of it? I'll make one or two more quick points. The receiving user is not only a person. The only embodiment in the specification for Claims 6, 31, and 39 require that the pager is what confirms receipt of a message. Claims 6, 31, and 39 say the ROU confirms receipt of the message. So the pager has to be attributed to the ROU or those claims would exclude the only embodiment in the specification related to it. As far as the personal jurisdiction is concerned, there's a contract that is in the record between Vodafone and Verizon. That contract expressly says that Vodafone sells messaging in Baltimore and throughout the U.S. That contract expressly says that Vodafone markets this messaging in Baltimore and throughout the United States to its subscribers. That contract expressly says the U.S. FCC rules, state and federal regulations govern all this. These contracts are directed toward the U.S. They cause the infringement here. They're intentional actions directed toward the forum. But isn't the invention facilitate communications between, let's say, a German user and a U.S. user when the U.S. user is in another country? So the whole system is used whenever the U.S. user is outside of the United States. Does that make a difference with respect to jurisdiction? Our primary argument on jurisdiction, Your Honor, is that these contracts, Vodafone enters into a contract with a U.S. carrier so that Vodafone's customers come to the U.S., jump on AT&T, send infringing messages, and Vodafone charges them for it. They pay Vodafone for that. That's the intentional action. It's a whole scheme for Vodafone to make a lot of money out of messaging that comes out of the U.S. Is there any value that Vodafone gets when the message is sent from Germany to a U.S. user who's in Brazil? Yes. If an AT&T handset is in Germany and sending a message, yes, Vodafone gets money for that, too. Okay. Thank you, Your Honor. Thank you. We'll reserve the remainder of your time. Let's see. Mr. Boren, just first for the domestic area. Yes. May it please the Court. Counsel correctly focused on the fact that Claim 4 is the only independent claim that is now asserted against the carrier defendants and the handset defendants that I'm here to speak on behalf of today. And while the appellant complains of some of the constructions of court below, I think they're manifestly correct. I'm not going to spend much of my time today talking about those constructions because they really aren't necessary for the court's final determination. And I'll explain to you why. However, I do believe they're manifestly correct. And I also believe that Judge Williams' order on summary judgment on Claim 4 with respect to the carriers is a model of clarity. It's short. It's 24 pages long. It's very clear. It sets out the bases on which the court granted summary judgment. And I only wish that the parties actually had done as well as Judge Williams did to clarify the issues. There are really three separate bases for summary judgment on Claim 4 for the carriers. And they are, as Judge Williams articulated them, that the accused systems do not allow the receiving users to input a second country. The panel has already talked about that briefly with respect to the photograph. It's on page 29 of the appellant's brief. Judge Williams held that the accused systems do not allow receiving users to create an ordered list of countries. The court has already discussed that issue briefly with counsel for the appellant. What about the argument that the user, I mean, going back to the picture that we've been looking at, we have a finger that's initiating a process or a system, and when it does so, a country is identified. Well, a country is not necessarily identified. What happens technically in all the facts that we're talking about today? Ultimately, a country's got to be identified so that the call goes to the right place or is received in the right place. But it may not be received, the person who selected that may not be in the country in which that carrier is based. But a person must select it, correct? A person must select a carrier, and if a person selects a carrier, then the system automatically assigns a country to that character, as I understand again from the Bates Declaration. So if a person selects one carrier versus another, or let's say three of them, there's a potential that three countries will ultimately be identified. A person can't select three countries. It can only select one or another. One at a time, right? One at a time. And the next day they can select another, or they select a carrier, and automatically you're saying that another country can be identified. Isn't the person who's pushing that or touching the screen actually ultimately selecting the country as well? Well, that's certainly the appellant's claim, Your Honor. I think that the claims called for in Judge Williams' claim construction calls for the person actually to select a country, not a carrier. And in this particular case, in some of these instances, if you look at the photograph, some of the carriers aren't specifically identified with the country. So while, for example, if I were to press E+, on that phone along with Mr. Bates when he was there, I think he said he was on the road to Switzerland, France, and Germany. If I were to select E+, an identification of the MSC, the Mobile Switching Center, that E+, is broadcasting from, would go into the database that tells where I should be receiving a message. But what's really identified is that Mobile Switching Center, and all the user knows is that he or that I have selected E+. I don't know what country E++ is associated with. A country, as I understand Mr. Bates' declaration, that's all we're going by, a country code of some kind is sent. But the user doesn't know that, and Judge Williams took the view, based on his claim construction, that in order to select a country, you have to select a country. You can't select a carrier and automatically have some country selected for you that you don't know about. And again, if you look at the purpose of the invention, the purpose of the invention is to allow a user to essentially override the automatic system to say, I expect to be in France, so I'm going to tell the paging system to page me in France. And if I don't tell the paging system to page me in France, then I will have already created a list of countries where I usually go. And the system will then default over to that list of other countries where I usually go, and the specification even describes them as being, I go most often to England, and then less so to Brazil, and so on. That's the way the system is designed. And so Judge Williams found, and I think correctly, in his claim construction, that the notion of designation, which is really the term we're talking about here in this particular case, requires the user to know what country he's designating. But again, I'll pull back from that a little bit and say that Claim 4 requires the system that Mr. Bates describes to do something that it absolutely cannot do. Without regard to claim construction, this system as described by Mr. Bates cannot distinguish between designating a country and creating an ordered list. We just heard when Plaintiff was up here talking and the court was asking questions that the ordered list is created when the receiving user presses the screen.  He selects a carrier, and the system records or knows that he's a U.S. user originally, and so there's a U.S. code that's also sent. That's how the list is created according to the appellant. Now, how is the country designated? You know, we have the two alternatives. We have the first that's designated, or there's an ordered list.  Now, the first alternative, how is it designated? When the user pushes the button. It's exactly the same thing. And Claim 4 requires a branching, doesn't it? It requires a determination, a determines limitation that says this is the one, two, fourth element of Claim 4, where the paging system determines if the second country is currently designated by the receiving user. If the same information is sent, whether the receiving user is designating or creating a list of countries, there is absolutely no way for the system to make that determination. We don't know. Was it a list? Was it a designation? And yet, the claim goes on to say when it determines that the second country has been designated, the system pages in the second country, or the system that Mr. Bates describes sends an SMS message to that country. But, if the system determines that there has been no designation, then it goes over to the list, except the list was created exactly the same way at exactly the same time as the designation. In other words, the claim doesn't work against the system to which it's directed. That is Judge Williams' third ground for granting summary judgment, and it is truly unassailable. We don't need to talk about the claim construction, which I again believe is manifestly correct, that the receiving user does have to be a human being. He or she, 14 times in the specification, equated with a subscriber, has to be a person doing this. The whole idea of the invention is that the person overrides the system and saves us all a lot of trouble. We don't have to go to that. All we have to do is look at the language of Claim 4 and look at the way the described system operates, and we know that the carriers cannot possibly infringe. Now, with respect to the list, I just want to say a couple of things. Assuming that Mr. Bates is correct, and we get a two-country list every time, every single time, whether you turn your phone on, whether you press a button, whether you walk off the plane and you accidentally left your phone on, a two-country list is always created. It does not do, that is not a predetermined ordered list in which paging is to be conducted as the claims in the patent require. It happens to be two countries. The one I'm registered to, which may not be the one I'm in, and the one that I bought my phone in, which is going to be the United States. Two countries. That's not a list. It's certainly not an ordered list, and paging operations are not conducted in an order, and this is really kind of important. I'm not sure I understand when you say it's not a list, it's a short list. You could say it's a short list. The same way you could say, for example, an empty carton, egg carton in the refrigerator, and a soap dish without soap in it in the bathroom is a list, is a grocery list. But those two things are not together. They're not written together, they're not correlated. It's a minor point, Your Honor. It's an interesting point, but you don't have to get to it. But it's really, it just happens to be the only two countries that the system ever knows about, because it looks at one place according to Mr. Bates. It looks at that database to see where is he, and it pages, and that's all the system ever does, or sends the message. Thank you. Thank you. Let's see. We'll hear next from Mr. Fetch on behalf of the software providers, I believe. May it please the Court. I have three points I would like to make on behalf of the software providers. First of all, if the Court affirms for the carriers on any of the three grounds the carriers have asserted as to why the claims regarding a receiving user are not practiced by the carriers, then all of those claims are gone as to all of the software providers to the extent the claims asserted against the software providers require action by the receiving user. So why don't you turn to the originating user claim. Very well. And tell us why your colleague is wrong with regard to Centillion. Right. And if you need to go back on that. I will. Thank you, Your Honor. First of all, my colleague and I couldn't disagree more in our reading of Centillion. And in fact, Centillion I would submit points the way. In Centillion, Judge Moore wrote, we never directly addressed the issue of infringement for use of a system claim that includes elements in the possession of more than one actor. In this case, the elements of this system claim are in the possession of two actors. The contentions of Mr. Roa and the plaintiff say so at appendix 18966 through 18968. Specifically, where the creation, the designation of a country, and the creation of a predetermined list is concerned, it's the receiving user that does it. So the receiving user is very critical. And indeed in this patent, this patent was created for the receiving user. The claim by this inventor is that he distinguishes over roaming because instead of looking for you anywhere in the world, which is the way the system works today, all the carrier systems, I'm going to tell you exactly where I'll be tomorrow, Judge. That's my second country, and if I'm not there, check me on a predetermined list. Okay. Now, what Judge Moore says there in Centillion, Judge Gross, is where you have two actors, receiving user who's critical because if there's no designation of a second country and a list, then the claim elements are not met, and originating user who has to send the message in the first instance. Now, let me make sure I understand. You're saying that for claims 11, etc., the group of claims we're now focusing on, that the receiving user must be doing the designation. No, you're wrong. Okay, I must have misunderstood. No, I'm not. Okay. What I'm indicating is that Yahoo, Clicatel, and Microsoft, all they are is in the words of Centillion, they are back-end users. In other words, the originating user sits down to their machine and sends a text message, but all Microsoft, Clicatel, and Yahoo do is they have a server, a back-end part of the operation that receives the message and passes it to the carrier. That's what Quest did in Centillion, and Judge Moore said, that's not enough, that's not, this court said, that's not direct infringement. The only way to prove infringement on behalf of the software providers, based on the mere sending of the message by the user, is to prove joint action under BMC Immunity Option. And simply put, Your Honors, Microsoft, Yahoo, and Clicatel do not control the actions of the carriers in how these messages are sent, and they don't control the actions of the user. We have no way of knowing when a user is going to sit down and decide to send a text message. Now, Judge Prost, let me answer. Does it have any type of contractual relationship or other legal obligation with the carriers? None. In the provision of the service? None. We just pass, we are a passive flow-through, if you will. And what Centillion says is, that is not direct infringement by your software provider, and it's not inducement to infringe, to simply sell them the software. It's up to the user whether or not they use it. Now, let's look at the claims, because even the originating user claims, which are only asserted against Clicatel and Yahoo, not Microsoft, because these originating user claims, Your Honors, that are asserted against Yahoo and Clicatel, require a website. Microsoft doesn't use a website. And in fact, Mr. Rowe has admitted that if all the claims go out against the carriers and receiving user, then all the claims against Microsoft are not infringed or gone. So it's turned now just to the originating user, 11 through 15 and 21 through 29. Mr. Rowe's theory is that because a Yahoo user on the website types in a telephone number, and that telephone number contains a country code, that that is the intent to designate the second country. Now, that is simply as a matter of fact, science, and law. Not possible. Your telephone number is personal to you. The entry of a telephone number does not designate the country in which you're to be paged. Your telephone number, Your Honors, remains the same wherever you are in the world. There is nothing about the inputting of your telephone number that designates the country in which you're to be paged. And in fact, the way the system works today, the system finds you wherever you are, and you cannot put in a preference. And let me just say, I know my time's up, but I should point you to the claim construction. This is very important, Your Honor. I point Your Honors to Appendix 103. This is on Claims 11 and 26, two of the independent claims, and this will answer the Yahoo! click-the-tell point, I believe, completely. The claim term was means for designating a second country from a plurality of potential countries in which the receiving user is to be paged. That's part of the originating claims, the originating only. Here was Judge Williams' claim construction. The originating user or receiving user inputting a selection of a second country from a plurality of countries to be used by the system as a country in which to page the receiving user. No appeal. Mr. Roa and the appellant accept that construction of the claim as correct. Now, simply put, the inputting by a Yahoo! or click-the-tell customer of a telephone number is in no sense of the word, and Mr. Bates doesn't even contradict this or raise an issue, is not used by the system as the country in which to page the receiving user. It's as simple as that, and that claim construction puts an end to the originating user claims, and from that claim construction, there has been no appeal. Okay. Thank you. Thank you, Mr. Bates. Now, our third advocate is Mr. Plattner, yes, for the foreign carriers. Thank you, Your Honors. One quick beginning. Judge Rayna asked the pointed question, what happens to the foreign carriers if the summary judgment of non-infringement is upheld with respect to the domestic carriers? And TPL's counsel said, well, it depends. As far as we can tell, if summary judgment of non-infringement in favor of the domestic carriers is affirmed, there is no basis on which the foreign carriers could infringe because their infringement is based on their customer's use of the domestic carrier's systems. So if the domestic carriers don't infringe when their own customers use the system, it's impossible for the patent to be infringed when the foreign carrier's customers use the domestic carrier's systems. But in the jurisdictional questions, especially involving 4K2, and I've looked at the various declarations that have been filed by the foreign carriers, and it seems to me that while there's an attempt to show that whatever contacts exist in the United States are insignificant or minimum, yet the declarations themselves show that there is revenue being generated as a result of use of the system by a subscriber, a German subscriber, while they're in the United States. Why shouldn't we find that that's sufficient contact for general sales throughout the United States? Because not just Maryland, but the users in California or Montana or anywhere else, isn't that a general marketing business activity within the United States that would fall under 4K2? No, Your Honor. The situation is this. The foreign carriers do not do business in the United States. They don't direct their... But you generate revenue from activity in the United States. Well, what... The domestic carriers generate revenue when foreign carrier customers roam on the system. And it is true that under the roaming agreements, there is some sharing of that revenue with the foreign carriers. But the whole purpose of the roaming agreements is because the foreign carriers not only don't do business in the United States, they're not allowed to. They're not licensed to do business. The whole process... I know that for traditional notions of doing business, of foreign country in the United States, that may be true, but with this particular type of activity, and when I look at the declarations, and the declarations themselves show that revenue is being generated in the United States, though one could say maybe it's insignificant to the overall revenue, but yet there is business activity as a result of this system, and the foreign carriers appear to be generating revenue whenever one of your subscribers is in the United States. Yes. To the extent that the court is saying that the roaming agreements result in some funds going from the domestic carriers to the foreign carriers, when the foreign carriers make use of the domestic carriers' networks, yes, that's true, but that's because the revenue is being generated in the U.S. by use of the domestic carriers' networks. And some of that revenue is shared, in a sense, because the customers are coming from the foreign carriers, but they're not doing business. Well, the reason that revenue is generated in that instance is because of the contractual agreement you have with the U.S. carriers. So there's an agreement. When my German user is in the United States, certain activity takes place, you're going to pay me X amount of dollars. That's not doing business in the United States? No. The fact that you generate revenue because when your customer comes to the United States and makes use of a domestic carrier, that's not doing business in the U.S. It may be that money comes from the fact that your customer in the U.S. is making use of a domestic carrier's network, and in return for that, the domestic carrier gives some of the portion of that revenue to the foreign carrier. Yes, money comes to the foreign carrier, but it's not because the foreign carrier does business in the United States. Let me ask you this way. If no German subscriber comes to the U.S., then there's no money to be made in the U.S. at all? Is your point, Your Honor, that if a German subscriber does not come to the U.S., then there's no money to be made from that subscriber? Correct. Or let's say there's no German subscribers that come to the U.S., none. Right. Then there's going to be no revenue generated as a result of activity in the U.S. Certainly that's true. If the German subscribers aren't using the U.S. networks, then there's no use of the U.S. networks, and therefore there's no money being generated by the U.S. carriers, some of which is paid pursuant to the roaming agreements to the foreign carriers. The mere fact, and I see my time is up, the mere fact that some money flows to the foreign carriers doesn't mean they're doing business in the United States. The whole reason for the roaming agreements, the reason they're required, is because the foreign carriers are neither licensed to nor do business in the United States. That's Red Wing Shoe. Okay. Thank you, Mr. Feinberg. Now, we ran over, if my arithmetic is correct, two minutes, so we'll add two minutes to your time on rebuttal. Mr. Rowland. Thank you, Your Honor. I'm not sure if I heard it correctly, but if Microsoft's counsel said that Microsoft does not have any contractual relations with carriers, that's wrong. In the record, there's an example contract between Microsoft and Rogers. That starts at A25194. What is your theory with respect... Can we focus a little bit, then, on the originating users in this Petillion case, and what is your response to Mr. Pappas's arguments with respect to his clients and why this is distinguishable from Petillion? The originating users who send a message... Those are the customers? The customers. They're direct infringers for the exact same reasons as in NTP and as in Centillion. Whenever they send a message... And his clients are then charged with inducement? Yes. In addition, his clients are also charged with direct infringement under 271A because they also use the system, and that's only with respect to, I believe, independent claims 4 and 9. The reason for that is there's nothing in the claim that is upstream of their servers. In Centillion, there was a claim... I guess the focus, though... I mean, these 4 and 9 aren't the originating user claims. I was focusing my questions right on the originating users, so I'm talking about 11 through 14 and those. That's why I'm getting... Okay, so can you focus on those? I apologize, Your Honor. Okay. Claim 11, claim 21, claim 28. Right. We are only alleging that customers use those claims. They are the only alleged direct infringers. We are not alleging that the companies are direct infringers under 271A. And your theory for the companies is then only the inducement? Yes, Your Honor. Okay. One final point. I believe Judge Reyna asked a question about generation of revenue by the foreign carrier. Certainly, when a foreign carrier subscriber is in the U.S. and that subscriber is sending messages, that subscriber pays the foreign carrier. So the foreign carrier makes a lot of money based on that. Additionally, under these agreements, if a U.S. subscriber is in England sending messages, the foreign carrier also makes money off of that under these agreements. For example, Appendix A28907, at the bottom it says SMS-MO 0.15. Where are you citing from? It's page, in the appendix, A28907. In the bottom portion it says SMS-MO 0.15. That's how much the foreign carrier makes for each message the U.S. subscriber sends while in that country. Thank you, Your Honor. Thank you. And we thank all counsel. The case is submitted.